# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

ROBERT J. LEWIS,

       Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY
    Defendants.

Civil Action No.: 15-cv-06275 (PGS-LHG)

MEMORANDUM AND
ORDER

Plaintiff Robert J. Lewis ("Plaintiff") appeals from the final decision of the

Commissioner of Social Security ("Commissioner"), denying Plaintiff disability benefits under

the Social Security Act of 1935 (the "Act"). Plaintiff claims he was disabled due to anxiety,

depression, calcium deposits in his kidneys, and a traumatic brain injury he had suffered years

before. (R. 260). Plaintiff seeks an award of benefits for the period of June 1, 2009 through

December 31, 2013. On April 30, 2014 an Administrative Law Judge ("ALJ") concluded that

Lewis was not disabled, and issued a written decision denying his application. After reviewing

the administrative record and arguments, this Court finds that the decision by the ALJ is

supported by substantial evidence of the administrative record and affirms the ALJ's decision to

deny Plaintiff disability benefits.

I.

Plaintiff's application, filed on October 28, 2010, claims disability beginning on June 1,

2009, was denied in part because of material drug and alcohol abuse (R. 97). Background

At the time of his initial application, Plaintiff was a forty-nine year old male. Plaintiff was never married, but has two children who stay with a past partner. He has a high school diploma and two additional years of studying boiler operation. Plaintiff was in the Navy between 1980 and 1982. On an unspecified date during his two years of service, Plaintiff ran headfirst into a metal bulkhead while aboard a ship, reportedly losing consciousness for an unspecified amount of time before recovering and returning to work. After an honorable discharge, Plaintiff worked in plumbing, but reportedly had trouble holding down jobs for various reasons, including behavioral, mental, and personal issues. Plaintiff last held a job in 2009, but has taken part in a paid therapy program through the Department of Veteran Affairs ("VA"). Plaintiff has been unsuccessful finding work. Plaintiff has a history of smoking, drinking, drug abuse, and homelessness.

Adult Function Reports ("AFR")

Upon applying for disability benefits, applicants must fill out an Adult Function Report in order to describe their daily activities and limitations in their own words.

In the Plaintiff's first report, Plaintiff reported a typical day consisted of "networking through friends for assistance," doing laundry, watching DVD's, and worrying about his current situation (A.R. 270). He currently has trouble sleeping, sometimes drinking to calm himself prior to bed (A.R. 271). Plaintiff reports he is able to self-groom, dress, bathe, shave, and use the toilet (A.R. 271). Plaintiff reports a distrust of the medication prescribed for his anxiety. He is capable of cooking for himself, doing laundry, and cleaning his apartment (A.R. 272).

He reports feeling isolated with no family in New Jersey (A.R. 273). He entertains himself by drawing, playing guitar, and reading sci-fi (A.R. 273). He does not drive a motor vehicle because he has no valid driver's license, but he does walk and commute through public

transit (A.R. 273). He shops, but spends money on alcohol to "medicate [his] anxiety" since becoming ill (A.R. 82, 273). Plaintiff reports that while he enjoys watching football and baseball, he must drink in order to relax, continues to worry about becoming homeless again, and that he still has trouble getting along with others due to his "brash...brutally honest" and intimidating nature (A.R. 274). Plaintiff notes that due to his condition, he has trouble lifting, squatting, climbing stairs, understanding verbal directions, following instructions, and getting along with others (A.R. 274-75). Plaintiff also notes that his urine is often bloody (A.R. 275). He has trouble breathing (A.R. 276). He finds he has difficulty with authority figures because he finds that he "lack[s] power," and that he has been terminated from prior jobs because he lacks the ability to understand the feelings of others, and that he handles stress poorly (A.R. 276). Finally, Plaintiff notes he has a mass on the frontal right lobe of his brain, possibly as a result of the injury while in the Navy (A.R. 277). He reports that he suffers from partial diaphragmatic paralysis, anxiety, and depression (A.R. 277).

On July 5, 2012, Plaintiff completed a second Adult Function Report with several differences compared to the earlier one. At that time, Plaintiff resided at a Veteran's Administration hospital (A.R. 292). He regularly checks the medical board for appointments, retrieves his mail, and goes to therapy (A.R. 292). Plaintiff no longer cooks for himself since the hospital staff prepares his meals, but he continues to do his own laundry and clean up after himself (A.R.294). He now considers church and his therapy sessions to be his main priorities, and that he does not socialize outside of church (A.R. 296). Plaintiff specifies he was once laid off because he did not go about a repair according to the directions of a supervisor and lashed out when he argued the result was the same (A.R. 297).

Reports and Evaluations with Regard to Plaintiff's Mental Health Conditions

*Records of the Veterans Administration in Lebanon, PA*

Plaintiff was admitted to the Veteran's Administration Hospital in Lebanon, Pennsylvania on September 11, 2008. On November 8, 2008, Plaintiff underwent an MRI with Dr. Eric Netland. The report found a mild encephalomalacia (softening of brain tissue) in the Plaintiff's frontal lobe, consistent with reported injury from his Navy days. No other mass, hemorrhage, lesions, or shifts were noted (A.R. 351-55).

On November 20, 2008, Plaintiff attended a psychology appointment, and was examined by psychologist Diane Hoover. Plaintiff was observed to be aware of his surroundings, well groomed, but angry upon realizing he was only meeting with a psychology technician and not the psychologist herself (A.R. 380). Plaintiff spoke of his injury while in the Navy, but "stressed more than once in the assessment that he [had] not experienced any memory or cognitive difficulties as a result of the injury" (A.R. 381). Plaintiff was noted to have an IQ of higher than 79% of his peers, relatively consistent with his story of having an IQ test score of 157 from grade school (A.R. 381). He also scored average or slightly above average in other areas like verbal reasoning, nonverbal reasoning, symbol search, and working memory (A.R. 381-83). He was found to have lower than average results when recalling new information, and was noted to be combative and aggressive (A.R. 382).

In Plaintiff's discharge notes, Dr. Errol Aksu and physician assistant Richard Emler found that Plaintiff suffered from alcohol dependence, cocaine abuse, marijuana abuse, anxiety disorder, obesity, chronic sinusitis, psoriasis, asymptomatic right hemidiaphragm paresis, mild encephalomalacia in the frontal lobe, chronic anxiety, and depression (A.R. 367-68). He registered a global assessment of function ("GAF") of greater than 60 (A.R. 367). Smoking

cessation was recommended, but declined, and Plaintiff was advised against further head injury and drug usage (A.R. 368). Psychopharmacologic treatment and psychotherapy were both advised, but Plaintiff declined. (A.R.368). Plaintiff was discharged as competent and employable (A.R. 368).

Plaintiff returned to a VA hospital, this time in East Orange, New Jersey, on January 7, 2011 to see psychologist Bennett Oppenheim, Ph.D. (A.R.651-55). Dr. Oppenheim found Plaintiff to be suffering from numerous ailments, opining that "[Plaintiff] has severe behavioral and psychological consequences as a direct result of his history of traumatic brain injury" (A.R. 651). Plaintiff's memory and concentration was poor, he engaged in erratic and unpredictable behavior, though he was found to be capable of self-care (A.R. 651). Plaintiff was also noted to suffer from headaches, frequent tinnitus, and a sensitivity to bright lights (A.R.652). In addition to having trouble sleeping, the examiner noted he was prone to aggressive outbursts, suffered from severe memory impairment, and an inability to perform the Serial 7's exercise or recall any of three randomly presented objects at a later time, a common mental assessment exercise (A.R. 652). Finally, although Plaintiff was found to lack homicidal and suicidal thoughts, he still exhibited impaired impulse control, insight, and judgment, and continued to abuse alcohol and marijuana (A.R. 652-53). The examining physician concluded Plaintiff "demonstrates total and complete impairment, both on an occupational and societal level" (A.R. 655).

*Mental Consultative Examination by Perry Shaw, M.D.*

On January 22, 2011, Plaintiff visited psychiatrist Dr. Shaw for a consultation examination ("CE"). (A.R. 631-34). Dr. Shaw observed that Plaintiff was obese, weighing 292 pounds, and was openly confrontational with people (A.R. 631). Plaintiff believed himself to be "very, very smart" and liked to give authority a "hard time" (A.R. 632).

Plaintiff reported to Dr. Shaw that his Navy injury resulted in profuse bleeding, unconsciousness for no more than a few minutes, and required a few sutures, but otherwise resulted in no amnesia and it was reported that he did not suffer headaches as a result, only "pressure" (A.R. 632). Plaintiff was evasive about the actual details of his substance abuse, claiming he no longer partakes in alcohol, marijuana, or cocaine, but admitted to previous cocaine abuse daily until 2004 (A.R. 632).

Dr. Shaw noted during the mental assessment that Plaintiff was comical about his "cutthroat family," recording that he joined the Navy looking for fun, how he was punished unofficially via Captain's Mast on several occasions for vague, unspecified reasons, and how he evasively dodged questions about his two teenage sons who currently reside with an ex-partner (A.R. 632-33). Plaintiff admitted his driver's license was suspended due to non-payment of child support (A.R. 633).

On examination, Plaintiff was well groomed, handled himself appropriately, was well spoken, and had a normal range of psychomotor activity (A.R. 633). He was also well oriented to time, place, and time, he was able to recall three words after three and five minutes, could recall past events, and was able to follow simple directions (A.R. 633). Plaintiff appeared capable of taking care of everyday chores like cooking, cleaning, and laundry (A.R. 633). While Plaintiff continued to show signs of evasive thinking, he was able to spell the word "WORLD" backwards and forwards, quickly add and subtract Serial 7's, and did not appear delusional (A.R. 633). He was able to concentrate, did not appear withdrawn, and still had a sense of insight, though he did seem paranoid and intent on controlling the interview (A.R.633). Dr. Shaw concluded by noting that Plaintiff does have a few friends, is capable of everyday living, and, assuming he does not abuse drugs any longer, Plaintiff "is capable of handling benefits on his own behalf" (A.R. 633-

34). The final diagnostic impression was a remission in alcohol, cocaine, and marijuana dependencies, panic disorder, a personality disorder with passive aggressiveness, with several narcissistic and antisocial traits.   Dr. Shaw assessed a GAF of 41-50 (A.R. 634)[1].

Medical Reports and Evaluations with Regard to Plaintiff's Medical Conditions

*Francky Merlin, M.D.*

On February 21, 2011, Plaintiff was evaluated by Francky Merlin, M.D. of Mercer County for a consultative physical evaluation. Dr. Merlin found Plaintiff to have a shortness of breath, feelings of depression, and a weight of 193 pounds (A.R. 635). Plaintiff admitted to smoking, drinking, and marijuana use (A.R. 635). Aside from a scar on frontal region of Plaintiff's head, Dr. Merlin found nothing remarkable regarding Plaintiff's behavior, skin condition, eyes and pupils, ears, throat, heart, chest, extremities, gait, joint movement, or range of motion (A.R. 635-36). Dr. Merlin did find that there was no air entry into Plaintiff's right lung base, but there were no wheezing, rales, or rhonchi noted. (A.R. 636).

The results of a January 26, 2011 chest x-ray were reviewed by Stephen Toder, M.D.  Dr. Toder found that Plaintiff's lungs appeared free of infiltrate and there was only minimal scarring in the right lung base (A.R. 639).

---

[1]   A GAF of 41 – 50 refers to serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work).  As noted above, GAF scores do not have a direct correlation to the disability requirements and standards of the Act. See, *65 Fed. Reg. 50746*, at 50764-65 (2000). In fact, as of May 18, 2013, the American Psychiatric Association no longer endorses the GAF scale as a measurement tool. See, Diagnostic and Statistical Manual of Mental Disorders (DMS-V) (5th ed. 2013). Nonetheless, GAF scores are still medical evidence that informs a Commissioner's judgment in assessing whether an individual is disabled and must be considered as such.

*Fauzia Ahmed, M.D.*

On March 3, 2013, Plaintiff was evaluated by Dr. Ahmed for an additional consultative examination. Dr. Ahmed noted that Plaintiff suffered two major injuries while in the Navy, but nothing more is specified (A.R. 1564). Dr. Ahmed also noted that "[Plaintiff had] a brain scan done which was normal" (A.R. 1564). In addition to getting aggravated easily, Plaintiff also suffers from severe anxiety disorder, depression, and mixed disorder (A.R. 1564). Dr. Ahmed recorded Plaintiff's current prescribed medication as BuSpar (10mg three times a day), Depakote (250mg extended release daily), trazodone (100mg at night), and gabapentin (300mg) to help with his panic attacks, impaired sense of balance, and anxiety (A.R. 1564-65). Plaintiff mentioned his partial diaphragmatic paralysis and how he believed it to be a major cause of his breathing problems (A.R. 1564). Plaintiff reported to Dr. Ahmed that he is a smoker (eight cigarettes a day), but that he did not use alcohol or drugs for the past two years (A.R. 1565).

Dr. Ahmed found no issue with Plaintiff's eyes, skin, heart, gait, movement range, and extremities (A.R. 1565). Dr. Ahmed did note that while Plaintiff was belligerent regarding his depression and anxiety, he was quick to calm down (A.R. 1565). In addition, Dr. Ahmed found "[g]ood air movement in both lungs" (A.R. 1565). Plaintiff was found to be capable of self-living, his "main limitation being his psychiatric problems along with his breathing problems" (A.R. 1565). Dr. Ahmed found Plaintiff capable of walking up to a mile, could stand for extended periods of time, bend, climb short flights of stairs, and carry up to 30 pounds for short distances (A.R. 1565). Dr. Ahmed also conducted a spirogram, which found Plaintiff's breathing capacity only about 40% that of the predicted values, with a lung age of 93 years old (A.R. 1568).

<u>Hearing Testimony</u>

On February 28, 2014, Plaintiff testified on his own behalf before ALJ Rogall.   Donald
Schader, a vocational expert was also present and testified.

Plaintiff testified that his traumatic brain injury from the Navy is 0% service-connected
as there was never a psychiatric evaluation performed at that time.  (A.R. 63). He did mention a
vague incident during his time in the veteran's administration work therapy program when a
truck "rolled and backed [Plaintiff] in" while working in a warehouse (A.R. 65). He reports that
ever since this incident, he simply rides around as a truck passenger during deliveries since the
program no longer wanted him in the warehouse where he had previously worked and was
injured (A.R. 65). Plaintiff confirmed that his last employment was as a plumber in 2009.  He
was laid off from that job after he did not get along with other employees, in addition to not
being familiar with Pennsylvania plumbing codes (A.R. 66). He noted that he lost his driver's
license after a DUI back in 2009 and consequently has never tried to regain it, largely due to the
cost of insurance (A.R. 68). Plaintiff also noted that in order to support himself, he both
performed odd jobs for people near where he lived (general household repairs) and sold drugs
(A.R. 69). After a one month stay in jail in December 2012, Plaintiff entered a court-sentenced
rehabilitation facility (A.R. 70). Upon leaving the program, Plaintiff took up drinking again, but
later reentered rehabilitation on his own accord (A.R. 71).

While in the new program, Plaintiff was given a HUD-VSH apartment and set up in the
Veterans Administration work therapy-program where he helped check building thermostats and
unloading truck cargo until the above-mentioned incident (A.R. 73-74). Plaintiff also testified
that he takes the opioid Tramadol as needed for his back pain from spinal spondylosis, as well as

Clozapan, busbar, and trazadone for his mental conditions (A.R. 79-80). He testifies he is friendly with the people at the VA program, as well as the people from public transit (A.R. 84).

Vocational Expert's Testimony

The vocational expert first clarified with the ALJ that the Plaintiff's work-therapy program did not qualify as substantial gainful activity ("SGA") and confirmed that Plaintiff originally worked in plumbing (A.R. 89). The vocational expert then testified that given Plaintiff's cumulative health conditions, continuing work in his previous field of plumbing would be impossible, but that a similarly situated person could find work as a mailroom clerk, a marking clerk, or a housekeeping cleaner (A.R. 90-91).

II.

The Administrative Law Judge's Decision

On April 30, 2014, L. Rogall, ALJ issued a decision finding that from June 1, 2009 to April 30, 2014, that Plaintiff was not disabled through December 31, 2013, the date last insured.

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since the date of the alleged onset of disability, June 1, 2009, because the work he did as part of the work-therapy program did not rise to the level substantial gainful activity (A.R. 41). The ALJ then determined at step two that Plaintiff suffered from the following severe impairments: spondylosis of the spine, anxiety, depression, bipolar disorder, and TBI (A.R. 41). The ALJ did not find Plaintiff's partial diaphragmatic paralysis to be severe, citing the Plaintiff's examinations with Dr. Shaw in 2011 and with Dr. Ahmed in 2013, when finding that although there was no air movement in the lower right lung, there was no wheezing, rales, or rhonchi, and that there was actually "good air movement" two years later (A.R. 42). The ALJ also found the Plaintiff's

minimal trouble walking distances, ability to lift small amounts of weight, and ability to perform daily life chores as evidence the lung impairment was non-severe (A.R. 42).

At step three, the ALJ found that the Plaintiff's spinal condition did not meet the equivalent of a listing 1.04 spinal disorder because the Plaintiff retained full range of motion, albeit with some pain (A.R. 42). The ALJ also found that Plaintiff's cumulative mental conditions did not rise to the equivalent of listings 12.02, 12.04, or 12.06 (A.R. 42). She determined that the Plaintiff did not have more than the minimum of two "marked difficulties" (more than moderate, but less than extreme) in either (1) daily life activity, (2) social functioning, (3) concentration, persistence, and pace, or (4) episodes of decompensation to satisfy the Paragraph B criteria (A.R. 42).

The ALJ relied on Dr. Shaw's February 2011 examination to determine Plaintiff only had mild restrictions in regard to daily life activities like personal grooming and cleaning (A.R. 42-43). She then cited both Dr. Shaw's report and the VA examinations from 2008 when determining that Plaintiff only had moderate restrictions with regard to social functioning, noting that while Plaintiff did have trouble interacting with people in general due to his "abrasive personality," he said himself that he felt better when talking, he had a few friends, and was in fact capable of being cooperative and friendly to other people (A.R. 43). The ALJ then determined that Plaintiff had minimal restrictions in regard to concentration, citing the various examinations from the VA in 2008 that found Plaintiff to have excellent verbal reasoning, satisfactory memory, notable leadership qualities, a high level of intelligence, and was clear, coherent, and with no delusional thoughts (A.R. 43). The ALJ noted there was no record of extended period of decompensation, and as such, no analysis was needed (A.R. 43). The ALJ

also noted that there was a lack of any Paragraph C criteria in the evidence, and as a result, found that the Paragraph C criteria could not satisfied (A.R. 43).

 At step four, comparing a person's current capacity for work compared to their old capacity, the ALJ determined that Plaintiff had a residual functional capacity ("RFC") for light work, including limited stair climbing, lifting, crouching and bending, and duties focused more on low impact, simple tasks (A.R. 44). The ALJ arrived at this determination by first evaluating whether the Plaintiff had any such medical conditions that would impair his work ability, and then determining the severity of said conditions based on the credibility of testimony and medical records (A.R. 44). The ALJ agreed that the alleged, disabling conditions of spinal spondylosis, anxiety, depression, brain injury, and kidney calcium deposits could reasonably cause work-impairing symptoms, but found that the extent to which the severity was claimed did not necessarily match medical evidence (A.R.45). The ALJ relied on the reports of both Dr. Merlin and Dr. Ahmed in finding Plaintiff had minimal physical limitations based on his physical examinations and his reported ability to conduct daily life activities with minimal issue (A.R. 45). The ALJ then cited to Dr. Shaw's examination, the 2008 VA reports, and the two AFR's as evidence that, despite Plaintiff's cumulative mental conditions, he was still capable of functioning day to day, that he could keep track of his VA appointments, and was able to effectively participate in the VA work-therapy program (A.R. 46-47).

The ALJ specifically notes that she gives little weight to the January 2011 VA report from East Orange, NJ (A.R. 48). She finds that the claims of severe memory loss, concentration impairment, executive function impairment, and inability to perform several mental exercises is not persuasive given that there is little to no other evidence substantiating these claims elsewhere in the record (A.R. 48). In fact, she points out that there is little to no mention of severe memory

loss, concentration or executive function impairment anywhere else in the record (A.R. 48). Instead, she notes that in almost all his other examinations, he was clear, coherent, well-oriented, able to complete mental exercises to a satisfactory level, and that his personality was fairly friendly at times (A.R. 48).

Finally, the ALJ recognized that while the Plaintiff could not resume his old line of work in plumbing given that his current RFC was lower than what would be required with his old job, the Plaintiff could still find meaningful work based on the testimony of the VE (A.R. 49-50). She accepted the VE's testimony that positions like that of a mailroom clerk, marking clerk, or household cleaning would be appropriate for someone with comparable medical issues to the Plaintiff (A.R. 49-50). For the above reasons, the ALJ found the Plaintiff not disabled and denied benefits (A.R. 50).

III.

*Standard of Review*

Review of the Commissioner's final decision is limited to determining whether the findings and decision are supported by substantial evidence in the record. *See Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); 42 U.S.C. §405(g). The Court is bound by the ALJ's finding of fact if they are supported by substantial evidence in the record. 42 U.S.C. § 405(g). *See Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hartranft*, 181 F.3d at 360 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation omitted)). *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla. *See Richardson*, 402 U.S. at 401; *Morales*, 225 F.3d at 316; *Plummer*,

186 F.3d at 422. Likewise, the ALJ's decision is considered to not be supported by substantial evidence when there is "competent evidence" to support the alternative and the ALJ does not "explicitly explain all the evidence" or "adequately explain his reasons for rejecting or discrediting competent evidence." *Sykes v. Apfel*, 228 F.3d 259, 266 n.9 (3d Cir. 2000)

The reviewing court must view the evidence in its totality. *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984).

> A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence -- particularly certain types of evidence (e.g., that offered by treating physicians) -- or if it really constitutes no evidence but mere conclusion.

*Morales*, 225 F.3d at 316 (citing *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). *See Benton v. Bowen*, 820 F.2d 85, 88 (3d Cir. 1987). However, the district court's review is deferential to the ALJ's factual determination. *Williams v. Sec'y of Health and Human Services.*, 970 F.2d 1178, 1182 (3d Cir. 1992) (*en banc*) (stating that the district court is not "empowered to weight the evidence or substitute its conclusions for those of the fact finder."). A reviewing court will not set a Commissioner's decision aside even if it "would have decided the factual inquiry differently." *Hartranft*, 181 F.3d at 360. But despite the deference due to the Commissioner, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence." *Morales*, 225 F.3d at 316 (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)).

Plaintiff's Arguments

Plaintiff challenges the ALJ's determination that he was not disabled. Specifically, Plaintiff challenges the ALJ's ruling that his partial diaphragmatic paralysis is not a severe

impairment, that the ALJ's step three analysis is beyond judicial review, that the RFC is not based on substantial evidence, and that the rejection of the evidence from the VA was in error.

First, Plaintiff challenges the ALJ's finding that his partial diaphragmatic paralysis was not in fact a severe impairment. Plaintiff's argument cites to the definition of "severe impairment" per the regulations, which finds a condition is not severe when "an impairment or combination of impairments . . . does not significantly limit [one's] physical or mental ability to do basic work activity." 20 C.F.R. § 404.1521. Plaintiff argues that according to Third Circuit precedent, the test to determine a severe impairment is a *de minimis* test, citing the Court's current understanding of the severity standard. *See McCrea v. Commissioner*, 370 F.3d 357 (3d Cir. 2003); *Newell v. Commissioner*, 347 F.3d 546, 546 (3d Cir. 2003) ("An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality or a combination of slight abnormalities which have 'no more than a minimal effect on an individual's ability to work.'") (citing *Bowen v. Yuckert*, 482 U.S. 158 (2003)). It is important to note that the claimant bears the burden of proof when presenting their impairment. *See Bowen*, 482 U.S. at 146, n.5. Plaintiff argues that simply by demonstrating how the impairment results in a slightly-more-than-minimal effect on one's basic ability to work, it satisfies the *de minimis* test. (Pl's Br. at 21). According to the Administrative Record, though, the Plaintiff has little documentation to support this.

Basic work activities include walking, standing, sitting, lifting, pulling, understanding simple instructions, and other similar actions. 20 C.F.R. § 404.1521. Reviewing the Plaintiff's medical documentation reveals little evidence of impairment. Plaintiff noted that he suffers from shortness of breath on account of his diaphragmatic paralysis (A.R. 42, 972), but the remaining history shows little to indicate severe impairment. A January 2011 chest x-ray revealed no

infiltrate or other acute disease (A.R. 639) while his exam with Dr. Ahmed showed good air movement in both lungs with no cardiac complications, as well as an ability to walk up to a mile, stand and sit for extended periods of time, bend, climb short flights of stairs, and carry up to 30 lbs. for short distances (A.R. 1583). In addition, Plaintiff testified at his ALJ hearing he had no other physical complaints other than his back pain that would affect his ability to work (A.R. 77-79). The ALJ thus determined the lung impairment to be non-severe in light of these medical observations (A.R. 46-47).

Second, Plaintiff argues that the ALJ's analysis at step three is deficient. He argues that in proceeding through the step three analysis, the ALJ must first compare each identified severe impairment against those listed existing conditions in the Appendix 1. *See Burnett v. Commissioner of Social Security*, 220 F.3d 112 (3d Cir. 2000). In the event there is no direct correlation between a listed condition and the present conditions, the ALJ must compare the cumulative medical conditions present and analyze it as a whole in relation to the "medical equivalence" of the listed conditions. *See id.* Finally, the ALJ must offer sufficient analysis and review of the evidence to show proper comparisons were made. *See Jones v. Barnhart*, 364 F.3d 501 (3d Cir. 2004).

In examining the cumulative effect of Plaintiff's mental impairments, the Plaintiff argues the ALJ failed to properly review the different sections of a full step three analysis for mental conditions (Listings 12.02, 12.04, and 12.06). He argues that the ALJ failed to mention any Paragraph A analysis at all (elements of listed mental disorders), that the ALJ's Paragraph B analysis (criteria for measuring the functional impact of mental impairment on life) relied on cherry-picked evidence from the record while ignoring pertinent evidence elsewhere in the

record, and that it did not partake in any Paragraph C analysis at all (criteria for determining the viability of living alone or adapting to work).

In regard to the Paragraph A argument, the Plaintiff's argument is not persuasive. In reviewing a case, 20 C.F.R. Part.404, Subpart P indicates that a claimant must prove both Paragraph A and B criteria. The ALJ simply chose to proceed with a full analysis of Paragraph B, and, upon determining that Paragraph B was not satisfied, chose not to address Paragraph A as there would be no point given that the criteria for Paragraph B had already failed.

In regard to Paragraph B, the Plaintiff disputes the ALJ's categorization of Plaintiff's CPP as only mild. Plaintiff points to the psychologist session from the VA in January 2011 to indicate how he suffers from memory impairment, loss of focus, and poor concentration, further evidenced by his poor marks on the various mental evaluations during that session, showing "severe problems" with his degraded mental functions as proof of a marked restriction in his CPP functions (A.R. 651-55). Again, this argument is not persuasive. Though the Plaintiff accuses the ALJ of cherry-picking evidence, it actually appears that the Plaintiff is the one guilty of cherry-picking since the bulk of the medical record seems to indicate minimal issues with executive function and mental capabilities. The ALJ noted the Plaintiff was very intelligent, with good verbal skills and work history (A.R. 43), that the Plaintiff mentioned no issue concentrating in his 2010 AFR (A.R. 274), and cited to both the examination with Dr. Shaw (A.R. 633) and additional examination material from the VA (A.R. 831-32) to find Plaintiff had little trouble with concentration and related functions. Accordingly, the ALJ found the Plaintiff only suffered mild CPP restrictions.

Plaintiff also argues that the ALJ erred by not including any analysis for Paragraph C criteria, instead only mentioning how she did not see any evidence as to the presence of

Paragraph C criteria. Although the ALJ only briefly addressed the matter, no more seemed to be necessary. Paragraph C deals with criteria related to adapting to work and being able to live alone, and multiple documents from the record support the conclusion that there was no criteria to examine in this regard. Plaintiff made regular mention to being able to care for himself while home (A.R. 272, 633, 1557, 1765), and medical records regularly grade his GAF as between 60-65 (A.R. 367, 887, 1508). The ALJ's decision to only brief mention Paragraph C is also supported by the original claim examiners, both of whom found no reason to involve Paragraph C criteria (A.R. 103, 124).

It should also be noted that GAF scores do not have a direct correlation to the disability requirements and standards of the Act. *See* 65 Fed. Reg. 50746, at 50754-65 (2000). In fact, as of May 18, 2013, the American Psychiatric Association no longer endorses the GAF scale as a measurement tool. *See* Diagnostic and Statistical Manual of Mental Disorders (DMS-V) (5th ed. 2013). Nonetheless, GAF scores are still medical evidence that informs a Commissioner's judgment in assessing whether an individual is disabled and must be considered as such. Any deviation in Plaintiff's GAF is therefore only informative. As a result, the Plaintiff's argument is not persuasive.

Third, Plaintiff contends that the RFC determined by the ALJ was not supported by substantial evidence, and it does not abide with the *Cotter Doctrine*. *See generally*, *Cotter v. Harris*, 642 F.2d 700 (3d Cir. 1981) (stating that the administrative decision must recite all probative evidence, their level of credibility, and include a comprehensive, analytic conclusion).Plaintiff argues that the ALJ simply chose to include "a blanket recitation of the evidence followed by an announcement of [the] plaintiff's RFC" without the kind of comprehensive and expansive analysis that the doctrine requires (Pl's Br. at 30). In addition,

Plaintiff argues that the ALJ did not properly support her decision by indicating what reasoning she used to connect the evidence to the decision. As a result, the Plaintiff believes that the ALJ's determination that the Plaintiff was capable of (1) simple, repetitive tasks in supervised employment for forty hours a week, and (2) the exertional requirements of light work activity, is improper.

Plaintiff supports this claim by arguing that the medical evidence cited by the ALJ is suspect enough to not be conclusive. Specifically, that the medical findings of Dr. Merlin and Dr. Ahmed were incomplete. In regard to Dr. Merlin, Plaintiff contends that Dr. Merlin included no completed RFC form and made no specific mention of Plaintiff's capability for light work. In regard to Dr. Ahmed, Plaintiff contends that there was a deliberate omission of test results and diagnosis when Dr. Ahmed "[found] nothing wrong with the plaintiff," arguing that the doctor left out the diagnoses of TBI, depression, and anxiety. In relying on these two supposedly questionable medical records, Plaintiff contends that ALJ erred by using suspect medical evidence rather than more grounded evidence. Plaintiff proceeds to argue that the evidence from the January 2011 VA examination was more authoritative and contradictory, questioning why the ALJ did not bother to explain the contradiction before ruling, as per existing precedent. *See Allen v. Bowen*, 881 F.2d 37, 41-42 (3d Cir. 1989) (finding that a physician's opinion cannot be rejected unless the ALJ relies on another piece of medical evidence to refute the original opinion, otherwise the original opinion is binding).

Plaintiff also contends that the ALJ erred when conversing with the VE. Plaintiff reasons that the hypothetical questioning was improper because the questions were not specific enough and, when presented, did not reflect the full, credible quantity of evidence. When the hypothetical questioning reflects unfavorable medical evidence that is openly contradicted by

other evidence in the record, the VE's testimony is not substantial evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). Because the ALJ asked the VE about the Plaintiff's work capacity in general terms, Plaintiff contends this disqualifies the testimony since it possibly reflects contradictory medical evidence.

The reasoning above is not persuasive given the existing precedent. It is well established that the ALJ is the sole individual responsible for determining the RFC based on the medical record as a whole. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). The ALJ worked with a plethora of medical evidence that supported a finding of not disabled through the record: the plaintiff admitted only his back was physically impaired, but was still manageable (A.R. 77-79); chest x-rays on multiple occasions showed no severe impairments (A.R. 639, 1688); and a capacity was found for light work activities, both self-described and noted by medical professionals (A.R. 44, 77-78, 636, 1565). In addition, though the medical evidence in the record continually references the Plaintiff having mental impairment due to depression, anxiety, bipolar disorder, and the like, almost all medical examinations found the mental impairments to be minor, relatively speaking, in that the plaintiff regularly displayed signs of improvement. This was evident on multiple occasions: the Plaintiff was alert, coherent, and high scoring on multiple mental assessments at the VA in November 2008 (A.R. 386, 399); he expressed positive emotion and thinking about his situation on several occasions to several different examiners (A.R. 1187, 1300, 1594, 1621, 1739); and he registered GAF scores of 60-65 through this entire matter (A.R. 887, 1621, 1739).

In regard to the Plaintiff's argument that the ALJ ignored medical evidence, this is incorrect. The ALJ explained that she gave little weight to the January 2011 VA examination because the January 2011 VA exam was contradicted by all the other evidence in the record

(A.R. 48). Whereas the exam in question found severe impairment of all executive functions such as concentration, focus, and memory, no other medical exam in the record offered such a diagnosis (A.R. 48).

The Rejection of VA Evidence is in Error

Plaintiff's final argument is that the ALJ erred by only giving limited weight to the VA examination from January 2011. Plaintiff cites to one older case to argue that this examination should be granted substantial weight given its origin from the VA. *See Lewis v. Califano*, 616 F.2d 73, 76 (3d Cir. 1980) (classifying VA determinations as being entitled to "substantial weight").

However, it is clearly laid out that the ALJ has generous discretion when choosing which medical evidence to rely on. *See* 20 C.F.R. § 404.1527. An ALJ is free to give a specific medical opinion less weight if said opinion either does not present relevant evidence or if it does not appear congruent with the record as a whole. *See* 20 C.F.R. § 404.1527(c)(2). So long as the ALJ provides an explanation, the ALJ has the ability to decide which evidence to weigh more heavily and which evidence to reject as long as a rational basis for the decision exists. *See Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)*; Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 148 (3d Cir. 2007) (finding that an ALJ can grant different medical opinions different levels of weight so long as it is clearly explained why in the record). For that reason, the ALJ did not err in giving little weight to the January 2011 VA examination.

CONCLUSION

The Court's sole inquiry is whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached by the commissioner, and even

where evidence is susceptible of more than one rationale interpretation, it is the Commissioner's conclusions which must be upheld. Fargnoli v. Massanari, 247 F. 3d 34, 38 (3d Cir. 2000)

It is the Court's finding that the ALJ's decision was based on substantial evidence and is affirmed.

ORDER

This matter having been opened to the Court on the appeal of Plaintiff, Robert Lewis of the Commissioner of Social Security's decision denying him a period of disability and disability insurance benefits; and for the reasons set forth above, and good cause having been shown;

IT IS on this 11th day of December, 2017;

ORDERED that the decision of the Commissioner of Social Security is affirmed. The Clerk is directed to close the case.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.